UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2/10/16

———————————————————————————

HARVEY E. PICKERING,

                              Plaintiff,          **OPINION AND ORDER**

            - against -                           **14-CV-6902 (RLE)**

CAROLYN W. COLVIN,

                              Defendant.

———————————————————————————

**RONALD L. ELLIS, U.S.M.J.**

## I.    INTRODUCTION

Plaintiff Harvey Pickering ("Pickering") commenced this action under the Social Security

Act (the "Act"), 42 U.S.C. § 405(g), seeking judicial review of a final decision of the

Commissioner of Social Security (the "Commissioner") denying his application for

Supplemental Security Income ("SSI") benefits.  Pursuant to 28 U.S.C. § 636(c), the Parties have

consented to the jurisdiction of the undersigned.  (Doc. No. 9.)

Before the Court are the Parties' motions for judgment on the pleadings pursuant to Rule

12(c) of the Federal Rules of Civil Procedure.  (Doc. Nos. 16 and 18.)  Pickering raises two

issues: (1) the ALJ failed to accord adequate weight to the opinion of the treating physician; and

(2) the ALJ failed to properly consider the side effects of Pickering's medications.  (Plaintiff's

Memorandum of Law in Support ("Pl. Mem.") at i.)  The Commissioner argues that substantial

evidence of record supports the finding that Pickering was not disabled under the Act during the

period at issue,[1] and asks the Court to affirm the Commissioner's decision.  (Defendant's

Memorandum of Law in Support ("Def. Mem.") at 1.)  For the reasons that follow, Pickering's

———

[1] The period at issue runs from July 13, 2011, the date Pickering filed the application for SSI benefits, to June 28, 2013, the date of the ALJ's Hearing Decision. *See* 20 C.F.R. § 416.335 (The earliest month that SSI benefits may be paid is the month after the application for benefits was filed).

motion is **GRANTED,** the Commissioner's cross-motion is **DENIED**, and the case is

**REMANDED** for further proceedings before the Social Security Administration.

## II.  BACKGROUND

### A.      Procedural History

Pickering applied for SSI benefits on July 13, 2011, alleging disability beginning on

February 23, 2011, because of asthma, obesity, schizoaffective disorder, depression, anxiety,

partial amputation of the left second toe, and left arm fracture with internal pin fixation.

(Complaint, Doc. No. 1, at 1-2; *See also* Transcript of Administrative Proceedings ("Tr.") at 34-

43.)  The Social Security Administration ("SSA") initially denied Pickering's application on

October 12, 2011, and on December 19, 2011, Pickering filed a written request for a hearing

before an Administrative Law Judge ("ALJ").  (Tr. at 60-65, 69.)  Pickering's request was

granted and, on April 9, 2013, he appeared and testified via video teleconference at a hearing

before ALJ Sheena Barr.  (Tr. at 28-50.)  In a decision dated June 28, 2013, the ALJ found that

Pickering was not disabled and was not eligible for SSI benefits.  (Tr. at 21.)  Pickering

requested a review by the Appeals Council on July 24, 2013.  (Tr. at 7.)  On July 9, 2014, the

Appeals Council denied Pickering's request and the ALJ's decision became the Commissioner's

final decision.  (Tr. at 1-6.)  Pickering filed this Complaint on August 25, 2014.

### B.      The ALJ Hearing

#### 1.      Administrative Hearing Testimony and Other Sworn Statements

Pickering was born in New York City on June 17, 1963.  (Tr. at 138.)  He is five feet,

eight inches tall and weighs 185 pounds.  (Tr. at 156.)  Pickering is a high school graduate who

completed two years of college in 1993, where he earned an associate's degree and received

specialized training as an airplane mechanic.  (Tr. at 156-57.)  Pickering also worked as an

assembler in a retail store until June 1, 1993, when he had to stop working because of his mental and physical impairments. (Tr. at 156.) Pickering has not worked since that time. (*Id.*)

In December 2010, Pickering began seeing Dr. Nasreen Kader, a psychiatrist, who diagnosed him with depression and anxiety, and listed clinical findings of "depressed mood," "lack of motivation," "extreme anxiety," "insomnia," and "poor concentration." (Tr. at 519; 308.) At the ALJ hearing, Pickering testified that he sees Dr. Kader once a month for therapy and medication management, and that he has been receiving psychiatric treatment solely from Dr. Kader since their first meeting in 2010. (Tr. at 35.) He also testified that the medications prescribed by Dr. Kader help to alleviate his anxiety, but also sometimes cause dizziness, nervousness, difficulty concentrating, and paranoia. (Tr. at 35-36.) In addition to Dr. Kader's diagnoses of depression and anxiety, Pickering testified that he also suffers from asthma and joint pain. (Tr. at 37-40.)

At the hearing, Pickering testified that he has been suffering from asthma for "several years" and was hospitalized for the condition "several times." (Tr. at 37.) He testified that the asthma makes it hard to breathe, and that he can only walk about five or six blocks before losing his breath, at which point he requires a pump from an asthma inhaler to continue walking. (*Id.*) He also testified that he has been taking three asthma medications as part of his treatment. (*Id.*)

Pickering stated that he broke his left arm in a motorcycle accident a "couple years ago" and, because of the irregular nature of the break, physicians "had to put 11 plates and 19 screws to hold it together." (Tr. at 40.) As a result, he suffers from constant joint pain, especially "when the weather changes," but was advised not to have the screws surgically removed. (Tr. at 40-41.) Because of the discomfort in his left arm, Pickering testified that he can lift "maybe two pounds, or three pounds, or something like that." (Tr. at 41.) Pickering also testified that he had

3

his left toe amputated following another motorcycle accident "a couple years" prior to the hearing. (Id.) Although he is able to walk "okay," he stated that he has "a lot of pain" when doing so. (Tr. at 42.) Pickering testified that he can walk about five or six blocks before needing to "take the pressure off" his foot, and that he feels sharp pain at times similar to "being electrically shocked." (Id.) He also stated that he can stand for fifteen to twenty minutes before needing to sit down, and that he does not suffer from any back problems. (Tr. at 42-43.)

At the hearing, ALJ Barr asked Pickering about an August 2011 visit to a consultative examiner for the SSA, where he allegedly disclosed that he had used cocaine a few months prior to the examination. (Tr. at 43, 214.) Pickering denied having ever made the remark, stating: "I never said no such thing." (Tr. at 44.) Pickering also testified that he had used cocaine as a teenager, but was no longer using and had not used the drug since he was "like 18 years old, 19 years old." (Tr. at 43.)

ALJ Barr next turned to vocational expert Rocco Meola ("Meola"), who testified about Pickering's ability to adjust to certain kinds of work, based on the evidence in record. (Tr. at 45.) The ALJ asked Meola about a hypothetical individual of Pickering's age, education and work experience, who could do light work, and was limited to: (1) unskilled, low stress work, that required no more than occasional decision-making; (2) no more than occasional interaction with co-workers, supervisors, and the general public; (3) no more than occasional climbing; and, (4) no concentrated exposure to dust, fumes or odors. (Tr. at 45-46.) Meola testified that "with those limitations in the hypothetical, there [were] jobs that one [could] do." (Tr. at 46.) He went on to testify that the types of work consistent with the hypothetical would be jobs such as a labeler, a produce weigher, and an assembler. (Id.) Meola also testified that if the hypothetical

individual was off-task, or distracted, for up to fifteen percent (15%) of the workday, he would be able to perform the identified jobs. (Tr. at 48-49.)

## 2.    Medical Evidence

### a.    Evidence Prior to the Period at Issue

Prior to applying for disability benefits, Pickering received medical treatment at the Jacobi Medical Center at least six times. (Tr. at 219-37.) Records from the Center show that on several visits, Pickering denied any complaints. He was also regularly described as alert and oriented in all spheres. (Tr. at 219, 222, 224-28.)

On October 22, 2010, Pickering saw Dr. Anthony Greenridge, a physician at Bronx Lebanon Hospital ("Bronx Lebanon"), in connection with his application for the New York City Human Resources Administration ("HRA") public assistance program. (Tr. at 358-62, 450-53, 487-88.) The physical examination, which included chest, extremities, reflexes, sensation, motor system, and neurological examination, was normal throughout. (Tr. at 358-59.) Dr. Greenridge diagnosed Pickering with depression, anxiety, asthma, and stated that Pickering had "left forearm repair" and second left toe amputation because of a motorcycle accident. (Tr. at 361.) Dr. Greenridge assessed that Pickering was restricted to walking up to three hours per day, and to a low-stress work environment without exposure to dust. (Tr. at 359-60.)

Pickering also saw Dr. Jorge Kirschstein at Bronx Lebanon in connection with his public assistance application. (Tr. at 370-74, 524-32.) While a mental status examination revealed depressed mood and constricted affect,[2] Dr. Kirschstein noted that Pickering was calm and cooperative, with normal speech and neat appearance, as well as logical form of thought and

---

[2] A restricted or constricted affect describes a mild restriction in the range or intensity of the display of feelings. *See Affect*, GALE ENCYCLOPEDIA OF PSYCHOLOGY (2001), http://www.encyclopedia/com/topic/Affect.aspx (last visited Jan. 6, 2016).

normal thought content. (Tr. at 372.) Dr. Kirschstein, however, assessed that Pickering's ability to persist was severely impaired, and that his abilities to follow work rules, accept supervision, deal with the public, relate to co-workers, adapt to change, and adapt to stressful situations were all moderately impaired. (Tr. at 372-73.) Dr. Kirschstein diagnosed Pickering with major depressive disorder and anxiety disorder, and recommended that he be monitored for alcohol abuse. (*Id.*) Through HRA, Pickering was supplied with an application for SSI benefits, and was referred to Dr. Nasreen Kader for treatment. (Tr. at 426-27.)

Dr. Kader, a psychiatric specialist, examined Pickering on December 11, 2010, and continued to treat Pickering for his mental health conditions. (Tr. at 519, 308-09.) On February 23, 2011, Dr. Kader completed a form for HRA, listing diagnoses of depression and anxiety, in addition to her clinical findings of depressed mood, lack of motivation, extreme anxiety, insomnia, and poor concentration. (Tr. at 308-09, 474-75.) Pickering's prescription medications consisted of Celexa, Seroquel, Ambien, and Adderall.[3] (Tr. at 308-09.) Dr. Kader checked a box on the HRA form to indicate that Pickering was temporarily unemployable. (Tr. at 309.)

On April 27, 2011, Dr. Kader completed the same form for HRA. (Tr. at 476-77.) The assessment was the same as in February, except that clinical findings were listed as depressed mood, anhedonia, anxiety, and insomnia. (*Id.* at 476.) Dr. Kader again completed the HRA form on June 22, 2011. (*Id.* at 472-73.) The information on the form was identical to the information on the April 2011 form, except that the doctor added the medication Trazadone to

---

[3] Celexa, or Citalopram, is used to treat depression, and is sometimes used to treat eating disorders, alcoholism, panic disorder, premenstrual dysphoric disorder, and social phobia. Seroquel, or Quetiapine, is used to treat symptoms of schizophrenia, episodes of mania, or depression in patients with bipolar disorder. Ambien, or Zolpidem, is used to treat insomnia. Adderall is used as part of a treatment program to control symptoms of attention deficit hyperactivity disorder (ADHD), and to treat narcolepsy. *See* U.S. NATIONAL LIBRARY OF MEDICINE, MEDLINEPLUS (Dec. 22, 2015), https://www.nlm.nih.gov/medlineplus/.

Pickering's other four medications, and checked a box to indicate that Pickering was "[u]nable to work for at least 12 months (may be eligible for long term disability benefits)." (*Id.*)

### b.   Evidence Relating to the Period at Issue

At issue before the Court is the period beginning on July 13, 2011, the date Pickering applied for SSI benefits, and ending on June 28, 2013, the date of ALJ Barr's decision.

### (1)   Treating Psychiatrist Dr. Nasreen Kader, M.D.

During the relevant period, Dr. Kader saw Pickering on January 18, 2012, and noted that he was "stressed" and "anxious," but sleeping well. (Tr. at 581.) At the request of Pickering's counsel, Dr. Kader completed a "Psychiatric Assessment" form dated January 22, 2012, where she noted that Pickering suffered from "depressed mood," "extreme anxiety," "paranoid ideation," "lack of motivation," "insomnia, [and] poor concentration." (Tr. at 556.) Dr. Kader also stated that she treated Pickering for "monthly outpatient medication management" and "therapy." (*Id.*) Dr. Kader diagnosed Pickering with "mood disorder," "paranoid (psychotic disorder, NOS [not otherwise specified])," and "anxiety disorder, NOS [not otherwise specified]." (Tr. at 557.) Describing the limitations to support her psychiatric assessment, Dr. Kader noted that Pickering: (1) was unable to take public transportation; (2) was unable to take criticism from supervisors; (3) was paranoid about other people in the workplace; and, (4) had non-functional work skills. (Tr. at 559-60.) She surmised that Pickering's impairments were expected "to last at least twelve months," rated his ability to make occupational, performance, or personal social adjustments as "poor/none," and indicated that his overall prognosis was poor. (Tr. at 557-559.) She opined, however, that Pickering was able to manage his own benefits. (Tr. at 560.)

Dr. Kader's treatment notes from February 22, 2012, indicated that Pickering was "doing well" and did not report any suicidal or homicidal ideation, nor audiovisual hallucinations. (*Id.*) On March 21, 2012, she noted that Pickering denied suicidal or homicidal thoughts, but was "not sleeping." Dr. Kader increased Pickering's Seroquel prescription. (Tr. at 582.) On April 18, 2012, Pickering reported that with the help of Seroquel, he was "sleeping better." (*Id.*) Pickering again denied having any suicidal or homicidal thoughts or audiovisual hallucinations, but reported hearing "some whispering." (*Id.*) On May 23, 2012, Dr. Kader noted that Pickering was "doing well" with his clinical course, but had "[run] out of medication" two to three days early. (Tr. at 582.) On June 20, 2012, Pickering stated that he was anxious at times, but "sleeping well." (Tr. at 583.) On July 18, 2012, Dr. Kader noted that Pickering felt "anxious, depressed at times," was "not sleeping," and "still hear[ing] whispering." (*Id.*) On August 22, 2012, Pickering reported that the "whispering sounds [were] still there." (*Id.*) Nevertheless, Dr. Kader reported that he was "doing well." (*Id.*)

On September 19, 2012, Pickering reported that he was still feeling anxious, but "sleeping better." (Tr. at 584.) Dr. Kader decreased Pickering's Adderall prescription. (*Id.*) On October 17, 2012, she recorded that Pickering "had some anxiety attacks" and "sleep problems" in the preceding month. (*Id.*) She also noted that Pickering was still hearing voices. (*Id.*) On November 21, 2012, Pickering reported that he was not sleeping, and was hearing whispers. (*Id.*) Dr. Kader prescribed Zyprexa, an antipsychotic medication, and noted that Pickering was "becoming paranoid." (*Id.*) On December 19, 2012, she increased Pickering's Zyprexa prescription after he reported that he was "still feel[ing] anxious" and not sleeping. (*Id.*)

On January 30, 2013, Pickering reported that he had been admitted to "Bronx-Lebanon hospital for dizziness." (Tr. at 585.) Dr. Kader discontinued Zyprexa. (*Id.*) On February 20,

2013, Pickering stated that he was "sleeping better" and Dr. Kader noted that he was "doing better this month." (*Id.*) On March 27, 2013, Pickering reported that he was "feeling depressed" and, once again, "hearing whispering sounds." (Tr. at 586.) Dr. Kader increased Pickering's Seroquel and Celexa prescriptions. (*Id.*)

At the request of Pickering's counsel, Dr. Kader completed another "Psychiatric Assessment" form on April 13, 2013. (Tr. at 576, 586.) She reported the following clinical findings: "alert, oriented x 3,[4] hears voices (auditory hallucinations – some people talks [sic] to him), denies suicidal/homicidal ideations, impulse control – good." (Tr. at 576.) As in the January 2012 assessment, Dr. Kader stated that Pickering suffered from "depressed mood," "frequent panic attacks," "paranoid ideations" that "people are attacking him," "insomnia" and a "lack of concentration and motivation." (*Id.*) Dr. Kader recorded the diagnoses of mood disorder, "psychotic disorder," and "anxiety disorder." (*Id.*) Lastly, Dr. Kader rated Pickering's abilities as "poor-to-none" in occupational, performance, and personal-social adjustments. (Tr. at 577-80.)

On an April 24, 2013 visit to Dr. Kader, Pickering had a urinary drug screen, which tested positive for alcohol. (Tr. at 586.) Pickering denied the use of other drugs. (*Id.*) Dr. Kader reduced Pickering's Klonopin prescription, and discontinued Adderall. (*Id.*)

### (2)    Dr. Arlene Broska, M.D.

Dr. Arlene Broska performed a psychological consultative examination of Pickering on August 29, 2011. (Tr. at 213.) Pickering told Dr. Broska that he was hospitalized for two weeks in 2001 or 2002, after he attempted suicide by overdosing on cocaine. (*Id.*) Pickering reported

---

[4] Alert and oriented x 3 refers to a patient who is responsive to his or her environment, and knows: (1) who he or she is; (2) where he or she is; and (3) the approximate time. *See Alert and oriented x 3,* SEGEN'S MEDICAL DICTIONARY (2012), http://medical-dictionary.thefreedictionary.com/alert+and+oriented+x+3 (last visited Dec. 22, 2015).

that he began seeing Dr. Kader for medication management in December 2010, and that "his medication help[ed] him with his thinking and his sleep." (Tr. at 213-14.) He also reported that he drank a beer "everyday" and had used cocaine "several months" prior to the examination. (Tr. at 214.) Pickering also stated that he cleaned and did laundry once a week, and "[was] able to dress, bathe and groom himself." (Tr. at 215.) Pickering noted that "he prefer[red] to stay away from people" and "like[d] to sit by the river or the bridge . . . where he [could] be alone." (*Id.*) He added that he "[found] it very calming to be around water." (*Id.*)

On mental status examination, Dr. Broska assessed that Pickering's "demeanor and responsiveness to questions was cooperative," and his "manner of relating, social skills, and overall presentation were fair." (Tr. at 214.) Pickering was "casually dressed" and "well groomed," and had a normal gait, posture, and motor behavior. (*Id.*) His eye contact was "appropriate," his speech was "fluent" and voice "clear," and his "expressive and receptive language abilities were adequate." (Tr. at 215.) Dr. Broska observed, however, that Pickering's thinking was "marked by paranoid thought patterns" and his affect was "anxious." (*Id.*) Pickering's mood was "neutral," his sensorium "clear" and he was fully oriented. (*Id.*)

Dr. Broska assessed that Pickering's attention and concentration were "mildly impaired," but noted that he was able to "maintain attention and concentration during the interview." (Tr. at 215.) Pickering "reversed two letters in spelling 'world' backwards," but could count forward by threes and perform "simple calculations." (*Id.*) Dr. Broska also noted that Pickering's recent and remote memory skills were "mildly impaired." (*Id.*) Pickering was able to recall "3 out of 3 objects immediately and 2 out of 3 objects after five minutes," and could "repeat 5 digits forward and 2 digits backward." (*Id.*) Dr. Broska assessed Pickering's insight as "fair," his judgment as

"fair to poor," and his level of intellectual functioning as "in the average range with general fund of information appropriate to experience." (*Id.*)

Dr. Broska diagnosed Pickering with schizoaffective disorder and a history of alcohol and cocaine abuse, and assessed that he was able to "follow and understand simple direction and instructions" and "perform simple tasks independently." (Tr. at 216.) Dr. Broska opined that Pickering "may have some difficulty when learning new tasks," and "may not always make appropriate decisions, particularly around using drugs." (*Id.*) Dr. Broska stated that Pickering may also have difficulty "maintaining a regular schedule" and felt that he "may have difficulty at times relating adequately with others and appropriately dealing with stress." (*Id.*)

### (3)    Dr. William Lathan, M.D.

Dr. William Lathan performed an internal medicine consultative examination on August 29, 2011. (Tr. at 533-36.) He observed that Pickering was "appropriate in dress and affect and cooperative," and Pickering said that he was able to "perform all activities of personal care and daily living." (Tr. at 533.) Pickering also stated that he "drinks alcohol" but does not use "tobacco and street drugs." (*Id.*) Apart from a visible partial amputation of the left second toe, Dr. Lathan found no abnormalities on examination, and Pickering appeared to be in "no acute distress," with normal gait and stance. (Tr. at 534.) Dr. Lathan diagnosed Pickering with a history of asthma and depression, "status post fracture left upper extremity with internal pin fixation surgery," and "status post partial amputation of the second left toe." (Tr. at 535.) In his medical source statement, Dr. Lathan opined that Pickering would have moderate restrictions for "lifting, pushing, pulling and carrying with the left upper extremity," as well as a moderate restriction for "standing and walking." (*Id.*)

#### (4)    Dr. E. Kamin, M.D.

On September 14, 2011, after reviewing the evidence of record, state agency psychologist E. Kamin assessed Pickering's mental residual functional capacity ("RFC"). (Tr. at 537-54.) Dr. Kamin found that Pickering had a schizoaffective disorder, and a history of alcohol and cocaine abuse. (Tr. at 539, 545.) Dr. Kamin assessed no significant limitation in Pickering's ability to: (1) remember locations and work-like procedures; (2) understand, remember, and carry out very short and simple instructions; (3) ask simple questions or request assistance; and, (4) be aware of normal hazards and take appropriate precautions. (Tr. at 551-52.) Dr. Kamin also determined that Pickering could: (1) maintain attention and concentration for at least two-hour intervals; (2) sustain a normal workday and workweek; (3) maintain a consistent pace; (4) adapt to changes in a work setting; and, (5) use judgment to make simple work-related decisions in a low-contact setting. (Tr. at 553.) Dr. Kamin noted that Pickering might have difficulty responding to supervisors and coworkers appropriately and would have difficulty in dealing with the public. (*Id.*)

#### 3.    The Findings of ALJ Sheena Barr

On June 28, 2013, ALJ Barr issued her decision that Pickering was not disabled within the meaning of § 1614(a)(3)(A) of the Act and had not been disabled since July 13, 2011, the date his application was filed. (Tr. at 11.) The ALJ found that although Pickering had severe impairments in the form of asthma, obesity, schizoaffective disorder, depression, anxiety, and a history of polysubstance abuse, the impairments were not severe enough to meet or medically equals the severity of one of the listed impairments of C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. § 416.925 and § 416.926). (Tr. at 14.)

To reach this conclusion, the ALJ conducted the five-step sequential analysis as required by 20 C.F.R. §§ 404.1520, 416.920. At the first step, ALJ Barr determined that Pickering had not engaged in substantial gainful activity since July 13, 2011. (Tr. at 13.) At step two, the ALJ utilized evidence submitted by Pickering's examiners to determine that Pickering had the following severe impairments: "asthma; obesity; schizoaffective disorder; depression; anxiety; and a history of polysubstance abuse." (*Id.*) At step three, the ALJ determined that Pickering did not have an impairment or combination of impairments that meets or equals those listed in 20 § C.F.R. Part 404, Subpart P, Appendix 1, and thus Pickering was not presumed disabled. (Tr. at 14.)

Before continuing on to step four, the ALJ assessed Pickering's RFC. In making her assessment, ALJ Barr considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medial evidence and other evidence. . ." (Tr. at 16.) She cited the lack of mental and physical evidence to show a particularly pervasive or debilitating combination of impairments, such as x-rays and pulmonary function testing, which failed to show any acute abnormalities. (Tr. at 17.) The ALJ also relied on factors pursuant to the "Commissioner of Social Security Ruling 96-7p" in making her determination "because symptoms may sometimes suggest a greater degree of impairment than can be shown by the medical evidence alone." (Tr. at 18.) These factors include: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate the pain or other symptoms; (5) treatment, other than medication, the individual has received for relief of pain or other symptoms; (6) any measures other than treatment the individual has used

13

to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions caused by pain or other symptoms. (Tr. at 18-19.)

ALJ Barr found that Pickering's daily activities were not "greatly inhibited" by his daily or mental symptoms. (Tr. at 19.) The ALJ cited Pickering's statement to Dr. Lathan that he could handle all activities of personal care and daily living, and his statement to Dr. Broska that he could do some cooking, shopping, and laundry. (*Id.*) She determined that Pickering's treatment had largely been "conservative" because he had only one inpatient hospitalization for "physical and psychiatric problems" since the alleged onset date. (*Id.*) The ALJ stated that Pickering received "routine outpatient care" from Dr. Kader for his mental condition, and "intermittent treatment" for his physical disorders. (*Id.*)

Specifically regarding Pickering's physical conditions, The ALJ found that objective clinical findings were "very slight" and failed to support Pickering's testimony of pain and functional limitation. (Tr. at 17.) To support this determination, ALJ Barr noted that the objective medical evidence did not support Pickering's subjective allegations of disabling physical limitations. She stated that Pickering made few complaints regarding asthma or his "left foot and forearm problems" in the record. (Tr. at 19.) The ALJ also cited evidence of asthma treatment at Jacobi Medical Center between 2009 and 2011, which revealed visits several months apart for "mild intermittent" asthma. (Tr. at 17.)

The ALJ determined that Pickering's testimony about his psychiatric condition and functional limitations was not credible, as it was not supported by objective clinical findings. (Tr. at 17.) The ALJ noted that while Pickering described his underlying mental impairments as extreme anxiety, insomnia, depression, and anxiety disorder, and stated that his medications "caused side effects such as dizziness, nervousness, difficulty concentrating and paranoia," the

14

objective evidence regarding his psychiatric impairments did not support these "statements concerning the . . . limiting effects of these symptoms." (Tr. at 17-18.) She found that while Pickering professed difficulty in getting along with others, he was not homebound or isolative. (Tr. at 19.) She stated that Pickering's psychiatric complaints were "intermittent at best, with some complaints of auditory hallucinations but not at every visit. . ." (*Id.*) The ALJ contrasted these complaints with Dr. Kader's "frequent statements" that Pickering was doing "better" or "well." (*Id.*) While Dr. Kader's notes reflected that Pickering heard voices and whispers at times, the ALJ found that Pickering had not testified to such symptoms during the hearing, and that no other medical source in the record concurred with Dr. Kader's opinions regarding the nature and intensity of Pickering's condition. (Tr. at 20.) The ALJ concluded that the reports of Dr. Broska and Dr. Kamin, and Pickering's "admissions as to his daily activities," provided a "more substantial basis" for the mental RFC assessment than the findings of Dr. Kader. (*Id.*)

The ALJ considered whether there were any side effects from Pickering's medication, and determined that his allegations were not credible to the disabling extent alleged. (Tr. at 16-19.) In considering Pickering's credibility, the ALJ described his testimony regarding his claimed side effects from the medications. (Tr. at 16.) Pickering stated that the medications caused side effects such as dizziness, nervousness, difficulty concentrating, and paranoia"), and addressed several side effects. (Tr. at 19.) With respect to his paranoia, ALJ Barr noted that Pickering had one inpatient hospitalization in January 2013 for a combination of physical and psychiatric problems, but no other hospitalization despite his occasional complaints of auditory hallucinations. (*Id.*) ALJ Barr also explicitly focused on Pickering's ability to concentrate in determining his RFC. (Tr. at 15-17.) She did not find that Pickering's ability to concentrate was significantly diminished. (Tr. at 15-16.) Dr. Broska opined that Pickering's attention and

concentration were only mildly impaired and noted that he was able to maintain attention and concentration during the interview. (Tr. at 215), and Dr. Kamin assessed that Pickering could maintain attention and concentration for at least two-hour intervals. (Tr. at 553.)

ALJ Barr also cited the fact that Pickering had "not [been] fully forthcoming at the hearing" about his history of substance abuse. (Tr. at 19.) As part of her rationale, ALJ Barr cited Pickering's statement to Dr. Broska in August 2011, regarding his history of cocaine use and indicating that he drank daily, as well as evidence showing a positive toxicology screen for cocaine and marijuana in 1999, and an admission of marijuana use to an examining internist in January 2001. (*Id.*) "Against this evidence," ALJ Barr wrote, "the claimant's statements during the hearing, that he had not used alcohol or drugs since he was a teenager, carry very little credence." (*Id.*)

The ALJ determined that Pickering had the RFC to perform a range of light work that did not require concentrated exposure to dust, fumes, odors, or other pulmonary irritants, or more than occasional climbing. (Tr. at 16.) Given his RFC, she found that Pickering could perform simple, unskilled work that required no more than occasional decision-making, or occasional contact with coworkers, supervisors, and the general public, and concluded that Pickering's medical conditions would not significantly impair his ability to perform the demands of certain light work. (Tr. at 11, 16.) Having assessed Pickering's RFC, the ALJ continued on to step four of the analysis, and determined that Pickering had no past relevant work. (Tr. at 21.)

Finally, at step five of the analysis, the ALJ found that, given Pickering's age, education, work experience, and residual functional capacity, there were a considerable number of jobs in the national economy that he would be able to perform. (Tr. at 21-22; *see* 20 C.F.R. §§ 416.920(g), 416.969, 416.969a.) The ALJ supported her finding with testimony from the

16

vocational expert, Meola, which demonstrated that other work existed in significant numbers in the national economy that Pickering could do. (Tr. at 20; *see* 20 C.F.R. §§ 416.912(g), 416.960(c).) Accordingly, ALJ Barr found Pickering not disabled.

**C.     Appeals Council Review**

After the ALJ's decision issued on June 28, 2013, Pickering requested a review by the Appeals Council, which was denied on July 9, 2014. (Tr. at 1-7.)

## III.   DISCUSSION

**A.     Standard of Review**

Upon judicial review, "[t]he of findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]" 42 U.S.C. §§ 405(g), 1383(c)(3). Therefore, a reviewing court does not determine *de novo* whether a claimant is disabled. *Brault v. Soc. Sec. Admin. Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012) (per curiam) (citing *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996)); *accord Mathews v. Eldridge*, 424 U.S. 319, 339 n.21 (1976) (citing 42 U.S.C. § 405(g)). Rather, the court is limited to "two levels of inquiry." *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987). First, the court must determine whether the Commissioner applied the correct legal principles in reaching a decision. 42 U.S.C. § 405(g); *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999) (citing *Johnson*, 817 F.2d at 986); *accord Brault*, 683 F.3d at 447. Second, the court must decide whether the Commissioner's decision is supported by substantial evidence in the record. 42 U.S.C. § 405(g). If the Commissioner's decision meets both of these requirements, the reviewing court must affirm; if not, the court may modify or reverse the Commissioner's decision, with or without remand. *Id.*

An ALJ's failure to apply the correct legal standard constitutes reversible error, provided that the failure "might have affected the disposition of the case." *Pollard v. Halter*, 377 F.3d

183, 189 (2d Cir. 2004) (quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)); *accord Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008). This applies to an ALJ's failure to follow an applicable statutory provision, regulation, or Social Security Ruling ("SSR"). *See, e.g.*, *Kohler*, 546 F.3d at 265 (regulation); *Schaal v. Callahan*, 933 F. Supp. 85, 93 (D. Conn. 1997) (SSR). In such a case, the court may remand the matter to the Commissioner under sentence four of 42 U.S.C. § 405(g), especially if deemed necessary to allow the ALJ to develop a full and fair record to explain his reasoning. *Crysler v. Astrue*, 563 F. Supp. 2d 418, 428 (N.D.N.Y. 2008) (citing *Martone v. Apfel*, 70 F. Supp. 2d 145, 148 (N.D.N.Y. 1999)).

If the reviewing court is satisfied that the ALJ applied correct legal standards, then the court must "conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision." *Brault*, 683 F.3d at 447 (quoting *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009)). The Supreme Court has defined substantial evidence as requiring "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *accord Brault*, 683 F.3d at 447-48. The substantial evidence standard means once an ALJ finds facts, a reviewing court may reject those facts "only if a reasonable factfinder would have to conclude otherwise." *Brault*, 683 F.3d at 448 (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)) (emphasis omitted).

To be supported by substantial evidence, the ALJ's decision must be based on consideration of "all evidence available in [the claimant]'s case record." 42 U.S.C. §§ 423(d)(5)(B), 1382c(a)(3)(H)(i). The Act requires the ALJ to set forth "a discussion of the evidence" and the "reasons upon which it is based." 42 U.S.C. §§ 405(b)(1). While the ALJ's

decision need not "mention[] every item of testimony presented," *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983) (per curiam), or "reconcile explicitly every conflicting shred of medical testimony," *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (quoting *Fiorello v. Heckler*, 725 F.2d 174, 176 (2d Cir. 1983)), the ALJ may not ignore or mischaracterize evidence of a person's alleged disability. *See Ericksson v. Comm'r of Soc. Sec.*, 557 F.3d 79, 82-84 (2d Cir. 2009) (mischaracterizing evidence); *Kohler v. Astrue*, 546 F.3d 260, 269 (2d Cir. 2008) (overlooking and mischaracterizing evidence); *Ruiz v. Barnhart*, No. 01 Civ. 1120 (DC), 2002 WL 826812, at *6 (S.D.N.Y. May 1, 2002) (ignoring evidence); *see also Zabala*, 595 F.3d at 409 (reconsideration of improperly excluded evidence typically requires remand). Eschewing rote analysis and conclusory explanations, the ALJ must discuss the "the crucial factors in any determination . . . with sufficient specificity to enable the reviewing court to decide whether the determination is supported by substantial evidence." *Calzada v. Astrue*, 753 F. Supp. 2d 250, 269 (S.D.N.Y. 2010) (quoting *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984)).

When "new and material evidence" is submitted, the Appeals Council may consider the additional evidence "only where it relates to the period on or before the date of the administrative law judge hearing decision." 20 C.F.R. § 404.970(b). "New evidence" refers to "any evidence that has not been considered previously during the administrative process." *Shrack v. Astrue*, 608 F. Supp. 2d 297, 302 (D. Conn. 2009).

**B.     Evaluation of Disability Claims**

**1.     Applicable Law**

Under the Social Security Act, every individual considered to have a "disability" is entitled to disability insurance benefits. 42 U.S.C. § 423(a)(1). The Act defines "disability" as an "inability to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* at §§ 416(i)(1)(A), 423(d)(1)(A), 1382c(a)(3)(A); *see also* 20 C.F.R. §§ 404.1505, 416.905. A claimant's impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); *see also* 20 C.F.R. §§ 404.1505, 416.905.

To determine whether an individual is entitled to receive disability benefits, the Commissioner is required to conduct the following five-step inquiry: (1) determine whether the claimant is currently engaged in any substantial gainful activity; (2) if not, determine whether the claimant has a "severe impairment" that significantly limits his or her ability to do basic work activities; (3) if so, determine whether the impairment is one of those listed in Appendix 1 of the regulations – if it is, the Commissioner will presume the claimant to be disabled; (4) if not, determine whether the claimant possesses the RFC to perform his past work despite the disability; and (5) if not, determine whether the claimant is capable of performing other work. 20 C.F.R. § 404.1520; *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999); *Gonzalez v. Apfel*, 61 F. Supp. 2d 24, 29 (S.D.N.Y. 1999). While the claimant bears the burden of proving disability at the first four steps, the burden shifts to the Commissioner at step five to prove that the claimant is not disabled. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 123 (2d Cir. 2012).

The ALJ may find a claimant disabled at either step three or step five of the Evaluation. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). At step three, the ALJ will find that a disability exists if the claimant proves that his or her severe impairment meets or medically equals one of

the impairments listed in the regulations. 20 C.F.R. §§ 404.1520(d), 416.920(d). If the claimant fails to prove this, however, then the ALJ will complete the remaining steps of the Evaluation. 20 C.F.R. §§ 404.1520(e), 404.1545(a)(5), 416.920(e), 416.945(a)(5).

A claimant's RFC is "the most [she] can still do despite [her] limitations." 20 C.F.R. §§404.1545(a), 416.945(a); *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010); *see also* S.S.R. 96-9P (clarifying that a claimant's RFC is her maximum ability to perform full-time work on a regular and continuing basis). The ALJ's assessment of a claimant's RFC must be based on "all relevant medical and other evidence," including objective medical evidence, such as x-rays and MRIs; the opinions of treating and consultative physicians; and statements by the claimant and others concerning the claimant's impairments, symptoms, physical limitations, and difficulty performing daily activities. *Genier*, 606 F.3d at 49 (citing 20 C.F.R. § 404.1545(a)(3)); *see also* 20 C.F.R. §§ 404.1512(b), 404.1528, 404.1529(a), 404.1545(b).

In evaluating the claimant's alleged symptoms and functional limitations for the purposes of steps two, three, and four, the ALJ must follow a two-step process, first determining whether the claimant has a "medically determinable impairment that could reasonably be expected to produce [her alleged] symptoms." 20 C.F.R. §§ 404.1529(b), 416.929(b); *Genier*, 606 F.3d at 49. If so, then the ALJ "evaluate[s] the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how [those] symptoms limit [the claimant's] capacity for work." 20 C.F.R. § 404.1529(c); see also 20 C.F.R. § 416.929(c); *Genier*, 606 F.3d at 49. The ALJ has "discretion in weighing the credibility of the claimant's testimony in light of the other evidence of record." *Genier*, 606 F.3d at 49 (citing *Marcus v. California*, 615 F.2d 23, 27 (2d Cir. 1979)); *see also* 20 C.F.R. §§ 404.1529(a), 416.929(a) (requiring that a claimant's allegations be "consistent" with medical and other evidence); *Briscoe v. Astrue*, No. 11 Civ. 3509 (GWG),

2012 WL 4356732, at *16-19 (S.D.N.Y. Sept. 25, 2012) (reviewing an ALJ's credibility determination). In making the determination of whether there is any other work the claimant can perform, the Commissioner has the burden of showing that "there is other gainful work in the national economy which the claimant could perform." *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998) (citation omitted).

Pickering alleges that ALJ Barr: (1) failed to comply with 20 C.F.R. § 414.1527 by declining to accord controlling weight to the opinion of Dr. Nasreen Kader, his treating psychiatrist; and (2) made a disability determination that is not supported by substantial evidence because the ALJ made no mention of how the side effects of Pickering's medications would affect his RFC in her assessment. (Pl. Compl. at 3.) The Commissioner maintains that the ALJ properly applied the correct legal principles in reaching her decision. (Def. Mem. at 13.)

### 2.    The ALJ's Assessment of the Treating Physician Rule

The SSA regulations require the Commissioner to evaluate every medical opinion received. *See* 20 C.F.R. § 404.1527(c); see also *Schisler v. Sullivan*, 3 F.3d 563,567 (2d Cir. 1993). The treating physician's medical opinion as to the claimant's disability, even if retrospective, will control if it is well-supported by medically acceptable techniques and is not inconsistent with substantial evidence in the record. *See* 20 C.F.R. §§ 404.IS27(c)(2), 416.927(c)(2); *Gonzalez,* 61 F. Supp. 2d at 29. If the treating physician's opinion is not given controlling weight, the Commissioner must nevertheless determine what weight to give it by considering: (1) the length, nature, and frequency of the relationship; (2) the evidence in support of the physician's opinion; (3) the consistency of the opinion with the record as a whole; (4) the specialization of the physician; and (5) any other relevant factors brought to the attention of the ALJ that support or contradict the opinion. 20 C.F.R. §§ 404. 1 527(c)(2)(i-ii); *Schisler,* 3 F.3d

at 567-69. The Commissioner may rely on the opinions of other physicians, even non-examining ones, but the same factors must be weighed as enumerated above. 20 C.F.R. § 416.927(e). More weight must be given to a treating physician than a non-treating one and to an examining source as opposed to a non-examining source. 20 C.F.R. §§ 404. I 527(c)-(e), 416.927(c)-(e).

An ALJ cannot reject a treating physician's diagnosis without first attempting to fill clear gaps in the administrative record. *Rosa*, 168 F.3d at 78. "If an ALJ perceives inconsistencies in a treating physician's reports, the ALJ bears an affirmative duty to seek out more information from the treating physician and to develop the administrative record accordingly." *Id* (citing *Harnett v. Apfel*, 21 F. Supp. 2d 217, 221 (E.D.N.Y. 1998) (internal citations omitted)). Where there are deficiencies in the record, the duty to develop the record exists even when the claimant is represented by counsel. *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996). "The regulations also state that, '[w]hen the evidence we receive from your treating physician . . . or other medical source . . . is inadequate for us to determine whether you are disabled . . . [w]e will first recontact your treating physician . . . or other medical source to determine whether the additional information we need is readily available.'" *Id* (citing 20 C.F.R. § 404.1512(e)). The ALJ commits legal error by rejecting the treating physician's medical assessment without fully developing the factual record. *Rosa*, 168 F.3d at 78.

The ALJ considered Dr. Kader's treatment relationship with Pickering and noted Dr. Kader's specialty as a treating psychiatrist, but determined that the restrictive limitations assessed by Dr. Kader conflicted with: (1) Dr. Broska's examination findings; (2) Dr. Kamin's, Dr. Broska's, and Dr. Kirschstein's diagnoses assessing far less restrictive limitations; (3) Dr. Kader's lack of mental status examination findings; and, (4) the "frequent statements" in Dr. Kader's treatment notes indicating that Pickering was improving or doing well. (Tr. at 19-20.)

At the hearing, ALJ Barr asked that Dr. Kader's treatment notes be submitted within two weeks of the hearing. (Tr. at 33-34.) The ALJ then placed significant emphasis on the perceived inconsistencies between statements in the notes that Pickering was "doing better" or "doing well," and Dr. Kader's finding that Pickering had an extremely limited functional capacity. (Tr. at 582-85; 558.) For example, in May 2012, Kader noted that Pickering was "doing well" with medication, and in June and July 2012, she reported that Pickering was anxious and depressed only "at times." (Tr. at 582-83.) By August 2012, Dr. Kader's notes reflected continued improvement, with a report that Pickering was still "doing well," without explanation. (Tr. at 583.) In February 2013, following a few months with reports of anxiety and difficulty sleeping, Dr. Kader reported that Pickering's sleep had improved and he was once more "doing better." (Tr. at 585.) Dr. Kader's treatment notes indicating improvements in Pickering's conditions were inconsistent with the later, more restricted finding of April 2013, in which Dr. Kader noted that Pickering had a depressed mood, extreme anxiety, was paranoid, and had poor to no abilities to adjust to employment. (Tr. at 558.)

While she allowed additional treatment notes by Dr. Kader to be submitted after the hearing, the ALJ ultimately found that assertions that Pickering was doing well or better contradicted Dr. Kader's conclusion of an extremely limited RFC. On this basis, the ALJ did not give Dr. Kader's opinions controlling weight. (Tr. at 20; 33-34.) The Second Circuit recognizes that when confronted with a situation where there is insufficient explanation or lack of support for a treating physician's diagnosis of complete disability, the ALJ has a duty to develop the administrative record before rejecting a treating physician's diagnosis. *See Rosa*, 168 F.3d at 79; *see also Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998) (finding that it was "entirely possible" that the treating physician, if asked, "could have provided sufficient

explanation for any seeming lack of support for his ultimate diagnosis of complete disability). The additional evidence submitted at the instruction of the ALJ did not explain, and in fact only seemed to increase, the discrepancies in Dr. Kader's diagnosis. After receiving the treatment notes from Dr. Kader following the hearing, there is no indication that the ALJ attempted to seek additional information from Dr. Kader to explain the apparent inconsistencies between the submitted notes and her diagnosis of Pickering's inability to adjust to employment. It is especially troubling that the ALJ did not take steps to fill inconsistencies between Dr. Kader's assessments, given the fluctuating nature of mental impairments, and given that Dr. Kader had treated Pickering since 2010. *See Rosa,* 168 F.3d at 79 (quoting *Wagner v. Sec. of Health and Human Services,* 906 F.2d 856, 861 (2d Cir. 1999) ("These 'notes' take up a single page for the three years at issue . . . it thus cannot be seriously argued that they represent an exhaustive record of [claimant's] condition over the whole period"). Thus, the Court finds that the ALJ committed legal error by failing to fully develop the record.

### 3.    The ALJ's Decision was Not Supported by Substantial Evidence

The ALJ's determination that Pickering had the RFC for simple, unskilled work took into consideration both his physical and mental impairments, and was supported by medical records, as well as his purported limitations. The ALJ concluded that Pickering had the RFC for simple, unskilled work that required, in connection with his mental impairments, a low-stress and low-contact position that consisted of no more than occasional decision-making or occasional contact with co-workers, supervisors, and the general public. In connection with his exertional requirements, the ALJ determined that the RFC for simple, unskilled work allowed Pickering to occasionally climb, but avoid exposure to dust, fumes, odors, and other pulmonary irritants. (Tr. at 16; 21-22.)

The ALJ based her assessment of Pickering's RFC on the conclusions of Dr. Lathan,
Dr. Broska, and Dr. Kamin. (Tr. at 20.) The evidence regarding Pickering's physical
impairments that ALJ Barr used to support her determination included Pickering's testimony
that he was hospitalized for asthma one to two years prior to the hearing date. (Tr. at 17.) He
also stated that his left arm hurt because of hardware, that he could lift no more than two to
three pounds, and that he could stand for fifteen to twenty minutes, but had no problem sitting.
(*Id.*) The ALJ noted that overall, Pickering made "few complaints regarding asthma or his left
foot and forearm problems in the record." (Tr. at 19.) ALJ Barr considered Pickering's
treatment at Jacobi Medical Center between October 2009 and March 2011 for intermittent
asthma. Testing in March 2011 revealed mild obstructive airways disease. (Tr. at 219-37.)
Dr. Lathan performed an internal medicine examination on August 29, 2011, and observed that
Pickering "appeared in no acute distress, with normal gait and stance, and did not use any
assistive devices." (Tr. at 17; 533-36.) He did not cite any abnormalities of the extremities
apart from the partial amputation of his left second toe. Dr. Nathan concluded that Pickering
would have "moderate restriction for lifting, pushing, pulling and carrying" with his left arm.
(Tr. at 535.) He also determined Pickering's moderate restriction for standing and walking.
(*Id.*)

The evidence ALJ Barr used to support her determination of Pickering's mental
impairments included the opinions of consultative examiner Dr. Broska and state agency
psychologist Dr. Kamin. Based on her examination, Dr. Broska assessed that Pickering could
follow and understand simple directions and instructions, perform simple tasks independently,
and perform some complex tasks independently. (Tr. at 216.) Dr. Broska's evaluation yielded
largely unremarkable findings. Pickering was cooperative, responsive to questioning, and

26

maintained appropriate contact throughout the appointment. (Tr. at 213-217.) Moreover, Pickering's speech was intelligible, his voice clear, and language abilities seemed adequate. (Tr. at 214.) In addition, Pickering's mood was neutral, his senses were clear, and he was fully oriented. (Tr. at 215.) Dr. Broska assessed only mild impairments in attention, concentration and memory, and noted that Pickering was able to maintain attention and concentration during the examination, could count and perform simple calculations, and could recall three out of three objections immediately and two out of three objects after five minutes. (*Id.*) Dr. Broska also assessed that Pickering had average intelligence and that his general fund of information was appropriate given his experience. (*Id.*)

Dr. Kamin reviewed the record, including Dr. Broska's report, and assessed that Pickering had the ability to understand, execute, and remember simple instructions and work-like procedures, as well as the ability to "make simple work-related decisions in a low-contact setting." (Tr. at 553.) Dr. Kamin also assessed that Pickering could maintain attention and concentration for at least two-hour intervals, sustain a normal workday and workweek, and maintain a consistence pace. (*Id.*) Based on the findings of these consultative examiners, the ALJ concluded that Dr. Kader's suggestions of Pickering's greater functional restrictions were not supported by substantial evidence. (Tr. at 21.)

The Second Circuit has consistently refused to uphold an ALJ's decision to reject at treating physician's diagnosis because other examiners reported dissimilar findings. *See Rosa*, 168 F.3d at 81 (rejecting the Commissioner's reliance on the consulting physicians' opinions merely because they were inconsistent with those of the treating physician, and did not identify any serious impairments); *Carroll v. Sec. of Health and Human Services,* 705 F.2d 638, 643 (2d Cir. 1983) (holding that it was improper for the ALJ to disregard the finding of the treating

physician because the three remaining doctors who examined the claimant reached no such conclusions; *see also Sobolewski v. Apfel*, 985 F. Supp. 300, 314 (E.D.N.Y. 1999) ("The burden of proof is on the Commissioner to offer positive evidence that plaintiff can perform sedentary work, and the burden is not carried merely by pointing to evidence that is consistent with his otherwise unsupported assertion").

In this case, the ALJ failed to meet the burden that shifts to the Commissioner in step five of the analysis. *See Gonzalez*, 61 F. Supp. 2d at 29.  She did not have substantial evidence to justify her determination that Pickering retained the RFC to perform light, unskilled work.  The ALJ improperly rejected Dr. Kader's findings that Pickering suffered serious impairment in social and occupational functioning without filling the gaps in the administrative record.  Merely pointing to the opinions of Dr. Broska and Dr. Kamin, without offering positive evidence that Pickering can perform low-contact, low-stress work, is not sufficient to support a finding of not disabled.  While the Court recognizes the ALJ's use of a vocational expert, the testimony that was credited by the ALJ is not supported by the evidence in the record. *See McIntyre v. Colvin*, 758 F.3d 148 (2d Cir. 2014) (finding that the ALJ reasonably credited the testimony of the vocational expert which was not undermined by an evidence in the record, and which was given on the basis of the expert's professional experience and clinical judgment); *Chavez v. Astrue*, 699 F. Supp. 2d 1125, 1137 (C.D. Cal. 2009) ("[H]ypothetical questions to a vocational expert must consider all of the claimant's limitations").  The ALJ posited hypotheticals based on Pickering's exertional and non-exertional limitations, and specifically inquired about jobs that would require low to no contact with the general public, coworkers, and supervisors.  (Tr. at 28-50.)  The ALJ, however, ignored the vocational expert's finding that if an individual could not interact with coworkers or supervisors, it would eliminate all the jobs he previously indicated, because "there

28

[had] to be at least occasional interaction . . . at unskilled work activity." (Tr. at 48.)  Instead, the ALJ solely relied on the vocational expert's findings of the type of jobs that an individual could do requiring only occasional interaction with coworkers and supervisors.

Based on the inadequate record before the Court, the ALJ's reliance on the vocational expert, and her decision to reject Pickering's claim for disability benefits, cannot be upheld.

## C.     Remedy

Under 42 U.S.C. § 405(g), the District Court has the power to affirm, modify, or reverse the ALJ's decision with or without remanding for a rehearing.  Remand may be appropriate if "the ALJ has applied an improper legal standard."  *Rosa*, 168 F.2d at 82-83. Moreover, where an ALJ has committed a legal error that may have affected the disposition of the case, such a failure constitutes a reversible error.  *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004).  Here, the Commissioner failed to meet her burden in showing that Pickering could do other work, by committing a legal error and relying on evidence that was supported by the record.  The Court, therefore, rejects the ALJ's decision.  Because the ALJ failed to apply the proper legal standard regarding the treating physician, and thus the ALJ's decision was not supported by substantial evidence, the Court declines to reach the issue of the ALJ's consideration of the side effects of Pickering's medications at this time.

## IV.     CONCLUSION

For the reasons set forth below, Pickering's motion is **GRANTED,** the Commissioner's motion is **DENIED**, and the case is **REMANDED** for further proceedings.  Having resolved Doc. Nos. 16 and 18, the clerk of court is directed to terminate this action.

SO ORDERED this 10ᵗʰ day of February 2016.
New York, New York

_____
**The Honorable Ronald L. Ellis**
**United States Magistrate Judge**